Filed 10/17/17 (unmodified version attached)

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA


FIRST APPELLATE DISTRICT


DIVISION FIVE


| | |
|---|---|
| LIVING RIVERS COUNCIL, | A148400 |
| Plaintiff and Appellant, | |
| v. | (Alameda County |
| | Super. Ct. No. RG-14-717629) |
| STATE WATER RESOURCES | |
| CONTROL BOARD, | ORDER MODIFYING OPINION |
| Defendant and Respondent. | **[NO CHANGE IN JUDGMENT]** |

The opinion filed September 28, 2017, is modified in the following respects:

(1) On page 1 of the slip opinion, the first sentence under Section I(A), which currently reads "The Board was created by the State Water Commission in 1913 to administer the appropriation of water for beneficial purposes" is modified to read, "The Board was created as the State Water Commission in 1913 to administer the appropriation of water for beneficial purposes."

(2) On the listing of counsel page, the name of the Senior Assistant Attorney General is modified from "Robert W. Byren" to "Robert W. Byrne."

There is no change in the judgment.


1

Date: _____ _____

Jones, P.J.

Superior Court of Alameda County, No. RG-14-717629, Evelio Grillo, Judge.

Law Offices of Thomas N. Lippe, Thomas N. Lippe for Plainiff and Appellant.

William Jenkins, Anita Rudd Deputy Attorneys General; Kathleen A. Kenealy, Acting Attorney General of California; Robert W. Byrne, Senior Assistant Attorney General; Gavin G. McCabe, Supervising Deputy Attorney General for Defendants and Respondents.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| LIVING RIVERS COUNCIL,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>STATE WATER RESOURCES<br>CONTROL BOARD,<br><br>        Defendant and Respondent. | A148400<br><br>(Alameda County<br>Super. Ct. No. RG-14-717629) |

Appellant Living Rivers Council (Living Rivers) appeals from a judgment denying its petition for writ of mandate to compel respondent the State Water Resources Control Board (Board) to rescind its approval of a policy designed to maintain instream flows in coastal streams north of San Francisco. Living Rivers alleges several violations of the California Environmental Quality Act (CEQA; Public Res. Code, § 21000 et seq.) relating to the indirect environmental effects of surface water users switching to groundwater pumping as a result of the policy. We affirm.

## I. BACKGROUND

A. *The Board*

The Board was created by the State Water Commission in 1913 to administer the appropriation of water for beneficial purposes. (*Light v. State Water Resources Control Bd.* (2014) 226 Cal.App.4th 1463, 1481 (*Light*).) Its enabling statute describes its function as providing for "the orderly and efficient administration of the water resources of the state" and grants it the power to "exercise the adjudicatory and regulatory functions of the state in the field of water resources." (Wat. Code, § 174, subd. (a); former Wat. Code, § 174.)

1

The Board's permitting authority is limited to surface water and to "subterranean streams flowing through known and definite channels." (Wat. Code, § 1200; see *North Gualala Water Co. v. State Water Resources Control Bd.* (2006) 139 Cal.App.4th 1577, 1580, 1581 & fn. 1, 1590–1591 (*North Gualala*).) It does not have permitting authority over "percolating groundwater," i.e., "subsurface water that is not part of a subterranean stream," which is instead regulated by local agencies. (*North Gualala*, at p. 1582, fn. 1; see *Baldwin v. County of Tehama* (1994) 31 Cal.App.4th 166, 182; Wat. Code, §§ 10720 et seq., 10750.) The Board does have the authority to prevent the unreasonable or wasteful use of water regardless of its source. (Cal. Const., art. 10, § 2; Wat. Code, §§ 100, 275; *Light*, at p. 148.)

B. *Original Policy and SED*

Water Code section 1259.4, enacted in 2004, requires the Board to "adopt principles and guidelines for maintaining instream flows" of Northern California coastal streams "for the purposes of water right administration." In response, the Board noticed and distributed a draft "Policy for Maintaining Instream Flows in Northern California Coastal Streams" (Policy) and Substitute Environmental Document (SED). The draft Policy and SED focused on measures to protect native fish populations, particularly anadromous salmonids (steelhead trout, coho salmon and chinook salmon) by maintaining instream flows necessary to support those populations in the Policy areas (Marin and Sonoma Counties, and parts of Mendocino, Humboldt and Napa counties). In furtherance of this goal, the draft Policy established five principles to be followed in administering water rights: "1. Water diversions shall be seasonally limited to periods in which instream flows are naturally high to prevent adverse effects to fish and fish habitat; [¶] 2. Water shall be diverted only when the streamflows are higher than the minimum instream stream flows needed for fish spawning, rearing, and passage; [¶] 3. The maximum rate at which water is diverted in a watershed shall not adversely affect the natural flow variability needed for maintaining adequate channel structure and habitat for fish; [¶] 4. The cumulative effects of water diversions on instream flows needed for the

protection of fish and their habitat shall be considered minimized; and [¶] 5. Construction or permitting of new onstream dams shall be restricted. . . .”

According to the SED, its assessment of the Policy's environmental effects “was conducted at a programmatic level, which is more general than a project-specific analysis. The assessment was also conservative, in that if any reasonably foreseeable outcome of implementing the Policy for any one water diversion project could conceivably have a significant indirect effect on an environmental resource, then the effect was judged to be significant in all cases. [¶] Potential effects on environmental resource areas were considered in terms of the possible responses of affected persons. The assessment was also conducted by defining categories of actions that people might take in response to implementation of the Policy that could have indirect environmental impacts. In particular, instead of pursuing a water right application under the Policy, people may choose to develop water diversion projects under other bases of right. How people will respond to the implementation of the Policy, and where and when these actions may occur, cannot be predicted with certainty; however, for purposes of this assessment, the following actions that may be taken by people to develop diversions of water under other bases of right are defined in terms of: [¶] • increasing groundwater extraction and use. . . .”

Appendix D of the SED was a report prepared by Stetson Engineers, Inc. (Stetson) entitled “Potential Indirect Impacts on Municipal, Industrial and Agricultural Water Use and Related Impacts on Other Environmental Resources.” The report noted that the proposed Policy's restrictions on surface water diversions could lead some users to divert water from other sources, including groundwater pumping, and estimated the demand for future diversions in the Policy area and the indirect environmental impacts of such diversions. Table 18 of the report, “Assessment of Potential Indirect Environmental Impacts of Policy Restrictions,” summarized the potential actions by water users in response to the Policy on a county-by-county basis. With respect to groundwater pumping as a possible action, Table 18 stated that “[d]epletion of groundwater” was a potential indirect environmental effect of groundwater pumping. A potential secondary

3

indirect effect was the "[r]eduction in [stream] flows, particularly summer flows which may harm riparian vegetation or degrade habitat for sensitive riparian and aquatic wildlife."[1] Table 18 assumed "the total future diversion demand . . . would not be available due to Policy restrictions and that all future diversion demand would have to be supplied from alternative water supplies or, if inadequate, not supplied at all." This assumption represented "a very conservative (highest; most severe) estimate of the potential actions and the indirect environmental impacts as appropriative surface water may be available to satisfy some future diversion demands. In addition, surface water supplies may already be insufficient to meet all future demands regardless of the Policy."

At the Board's request, Stetson prepared maps delineating subterranean streams in the Policy area (Subterranean Stream Delineations or Delineations). Because the Board has jurisdiction over subterranean streams flowing in known and definite channels (Wat. Code, § 1200), the Delineations had the potential to improve the Policy's effectiveness by identifying locations where the Board would have permitting authority over groundwater pumping. In addition to the maps themselves, the technical report prepared by Stetson provided a methodology to identify subterranean streams where groundwater use could deplete stream flows. The Board did not disclose the Delineations or the related regulatory concept in the draft SED, although it did disclose that the mapping information was available in its January 2010 response to public comments. The draft Policy did not incorporate the Subterranean Stream Delineations or require their use.

On May 4, 2010, the Board passed a resolution certifying the SED and adopting the Policy.

C. *CEQA Challenge to Original Policy*

In October 2010, Living Rivers filed a petition for writ of mandate seeking to vacate the Policy based on alleged CEQA violations. The trial court rejected most of the

---

[1] Table 18 also summarized the potential effects of other possible actions by water users in response to the Policy: Diversions under riparian rights, water conservation efforts, the development of recycled or desalinated water, and the development and use of imported water.

4

CEQA claims, but found the SED had been deficient in two respects: (1) it failed to disclose the Subterranean Stream Delineations as a potential mitigation measure for the anticipated increased use of groundwater pumping; and (2) it failed to disclose there would likely be no CEQA review of the anticipated increase in groundwater pumping in certain counties due to the Board's lack of permitting authority over percolating groundwater and the lack of permitting requirements at the county level. The court issued a writ directing the Board to vacate the Policy and (1) "evaluate the [] Delineations as a potentially feasible mitigation measure for the anticipated increased use of percolating groundwater and make appropriate disclosures regarding that evaluation and resulting decision;" and (2) "present sufficient information to enable the decision makers and the public to understand and to consider meaningfully the limited legal options facing the Board to mitigate the expected increase in the use of percolating groundwater and the implications for the effectiveness of the vacated Policy."

D. *Revised SED and Policy*

In response to the trial court's ruling, the Board vacated the Policy and obtained additional CEQA documentation to comply with the writ. On February 22, 2013, it circulated revisions to the original SED, consisting of (1) revisions to sections 6.2 (Effects of Increased Groundwater Extraction and Use), 6.9 (Cumulative Impacts) and 7 (Summary of Impacts and Mitigation Measures in Policy-Based Reviews of Pending and Future Water Rights Applications); (2) a "Supplement to Appendix D" (Analysis of the Potential Impacts of Groundwater Pumping as an Alternative Source Due to Policy Adoption); and (3) revisions to portions of the Board's responses to public comments. We refer to these documents collectively as the Revised Substitute Environmental Document (RSED).

The RSED evaluated the Subterranean Stream Delineations as a mitigation measure and concluded they would not be feasible because (1) the likelihood of affected persons switching to groundwater pumping was uncertain; (2) the potential shift from surface water diversions to groundwater pumping that might be caused by the Policy was unlikely to cause a significant reduction in surface water flows; (3) adoption of the

5

Delineations would not assist the Board in regulating pumping outside the mapped areas, which represented just a small portion of the watersheds in the Policy area; (4) the Delineations were based on the information available at the time they were prepared and field inspections had not been conducted; accordingly, the maps did not purport to represent all subterranean streams within the Policy area and specific site inspections would be needed to verify the existence of subterranean streams and stream depletion areas; (5) the Board could consider the Delineations on a case-by-case basis even if they were not adopted as part of the Policy; and (6) the Board could regulate unacceptable impacts associated with groundwater pumping based on its authority to prohibit the unreasonable use of water.

The Supplement to Appendix D explained that while the original Appendix D provided useful information regarding future water demands and the adequacy of alternative supplies, "the analysis in Appendix D concerning the potential impact of groundwater pumping on surface water flows (and the potential indirect impacts resulting from a reduction in surface water flows) is misleading because it does not explain why a shift from surface water diversions to groundwater pumping that could be caused by the Policy is unlikely to cause a significant reduction in surface water flows. . . . [¶] [The adoption of the Policy] *will not cause* water diversions to occur. . . . [T]he policy will not operate to approve (or disapprove) any individual surface water diversion projects. . . .The Policy will not cause any more projects to be approved, or authorize projects to be approved subject to conditions that are less protective of the environment than would otherwise be imposed.  To the contrary, the Policy will impose *additional* restrictions on pending and future surface water diversion projects in order to protect instream flows. . . ."

Acknowledging that the Policy did have the potential to affect the source of any water diverted, the Supplement to Appendix D analyzed the effect of "persons switching to groundwater extraction and use in order to avoid complying with the Policy" and "those impacts attributable to the change in source of water supply."  Such potential impacts included "impacts to agricultural resources due to a lowering of the groundwater

6

table and impacts to the production rates of nearby wells" and "reduced surface flows." "The 2008 SED did not explain, however, that the potential reduction in surface flows is unlikely. In fact, a switch to groundwater pumping will not ordinarily deplete hydraulically connected surface water flows on a one-to-one basis, and in some cases the groundwater and surface water may lack hydraulic connection entirely, or the hydraulic connection may be indiscernible. A switch to groundwater pumping could cause a delay in surface flow depletion, which could in turn cause a significant adverse environmental impact, particularly if the delayed reduction in flows occurs during the summer months, but this potential impact is speculative and unlikely to occur in the Policy area."

The Supplement to Appendix D explained that at the onset of groundwater pumping, the groundwater in the vicinity of the pumped well is lowered within the so-called "cone of depression," which will continue to enlarge until the amount of groundwater pumped is recharged or replenished. When a river or stream serves as a source of recharge for the aquifer, pumping can reduce surface water flow. The amount of this reduction will vary, affected by impediments to hydraulic connectivity, the availability of water in other parts of the aquifer, the hydraulic gradient due to the slope of the water table, and the availability of other sources (precipitation, return flow from irrigation) to recharge water. While surface water diversions had a one-to-one impact on surface water flows, switching to groundwater pumping would result in an equal or lesser rate of depletion. More detailed analyses were required to precisely determine a particular well's depletion of surface flow. Currently the Board was aware of only one prospective surface water diverter switching to pumping as a result of the Policy, and due to a lack of connectivity between the diverter's well and the aquifer, "pumping of the well is highly unlikely to reduce surface water flows."

The Board prepared a statement of overriding considerations stating that while adoption of the Policy could have potentially significant indirect environmental effects if affected persons responded by increased groundwater pumping, that outcome was "entirely speculative" and was "unlikely to cause a significant reduction in surface flows." The statement also noted that project-level CEQA review and other regulatory

7

mechanisms could minimize or avoid the reduction in stream flow, though such measures would not reduce all such impacts to less than significant levels. "To the extent that implementation of regulatory requirements and mitigation measures do not fully mitigate indirect impacts, or are not deemed feasible or are not imposed by the agencies implementing or approving individual projects, the economic, social, and environmental benefits of the Policy outweigh any unavoidable adverse environmental effects."

On October 22, 2013, the Board certified the RSED, made new CEQA findings based on the RSED, adopted the statement of overriding considerations, and readopted the Policy without significant amendments. The Policy did not incorporate the Subterranean Stream Delineations as a mitigation measure.

E. *The Instant Action: Challenge to RSED and 2013 Policy*

Living Rivers filed a petition for writ of mandate on March 17, 2014, alleging CEQA violations related to the RSED's analysis of the environmental effects of increased groundwater pumping as a result of the Policy. The trial court denied the petition after issuing a detailed and thorough statement of decision discussing the issues raised in Living Rivers's briefing. As relevant to this appeal, the trial court rejected Living Rivers's claim that the RSED gave conflicting signals regarding the Board's previous finding that Policy-induced groundwater pumping would lead to significant impacts on stream surface flow. The court also rejected claims relating to the Board's decision not to adopt the Subterranean Stream Delineations as a mitigating measure. This appeal follows.

## II. DISCUSSION

Living Rivers contends the case must be remanded with directions to grant its petition for writ of mandate because (1) the RSED's conclusion that increased groundwater pumping was uncertain or unlikely was in conflict with the Board's finding that groundwater pumping could have significant effects on the environment; (2) the RSED did not adequately describe or discuss the adoption of the Subterranean Stream Delineations as a mitigation measure; (3) the RSED's stated reasons for finding the Subterranean Stream Delineations infeasible were erroneous as a matter of law.

8

A. *General Principles and Standard of Review*

The Policy adopted by the Board is a certified regulatory program. (See Cal. Public Res. Code, § 21080.5; 14 Cal. Code Regs., §§ 15250–15252.) Such programs are exempt from the requirement of an environmental impact report (EIR), but are still "subject to the broad policy goals and substantive standards of CEQA." (*City of Arcadia v. State Water Resources Control Bd.* (2006) 135 Cal.App.4th 1392, 1422.) Certification of a program is effectively a determination that the agency's regulatory program includes procedures for environmental review that are the functional equivalent of CEQA. (*Californians for Alternatives to Toxics v. Department of Pesticide Regulation* (2006) 136 Cal.App.4th 1049, 1059.) "The document used as a substitute for an EIR must include a description of the proposed activity with alternatives to the activity and mitigation measures as well as written responses to significant environmental points raised during the evaluation process." (*Conway v. State Water Resources Control Bd.* (2015) 235 Cal.App.4th 671, 680.)

In reviewing an agency's compliance with CEQA during the course of its legislative or quasi-legislative actions, the trial court's inquiry during a mandamus proceeding " 'shall extend only to whether there was a prejudicial abuse of discretion,' " which is established " 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' " (*Vineyard Area Citizens for Responsible Growth Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426 (*Vineyard*), citing Pub. Resources Code, § 21168.5.) We apply the same standard when reviewing a substitute environmental document for a certified regulatory program. (*POET, LLC v. State Air Resources Board* (2013) 218 Cal.App.4th 681, 712–713 (*POET*); *California Sportfishing Protection Alliance v. State Water Resources Control Bd.* (2008) 160 Cal.App.4th 1625, 1644 (*California Sportfishing*).)

"In evaluating an EIR [or substitute environmental document] for CEQA compliance, . . . a reviewing court must adjust its scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts." (*Vineyard*, *supra*, 40 Cal.4th at p. 435.) When the claim is

9

predominantly one of procedure, courts conduct an independent review of the agency's action, but when a challenge is made to a factual finding of the agency, we will review the record to determine whether the finding is supported by substantial evidence. (*POET*, *supra*, 218 Cal.App.4th at p. 713.) When the informational requirements of CEQA have not been met, an agency has failed to proceed in a manner required by law and has therefore abused its discretion. (*California Sportfishing*, *supra*, 160 Cal.App.4th at p. 1644.) In assessing such a claim, courts apply an independent or de novo standard of review to the agency's action. (*Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70, 83 (*Communities*).)

On appeal, we review the agency's action rather than the trial court's ruling, applying the same standard as the trial court. (*Vineyard*, *supra*, 40 Cal.4th at p. 427.) "We therefore resolve the substantive CEQA issues . . . by independently determining whether the administrative record demonstrates any legal error by the [agency] and whether it contains substantial evidence to support the [agency's] factual determinations." (*Ibid*.)

B. *The RSED Was Not Misleading With Respect to Groundwater Pumping*

Living Rivers contends the Policy should be vacated because the RSED supporting it "sen[t] conflicting signals regarding whether [P]olicy-induced increases in groundwater use will cause significant impacts." It notes that both the SED and the RSED found the Policy could cause more people to pump groundwater, and additionally found the impacts on groundwater resources and surface flows would be "significant." Yet, Living Rivers argues, the RSED "equivocates" by asserting these significant impacts are uncertain or unlikely. Having independently reviewed this claim that the informational requirements of CEQA were not satisfied (*Communities*, *supra*, 184 Cal.App.4th at p. 83), we conclude it is lacking in merit.

The Policy did not approve any particular project and was based on an environmental review conducted at a programmatic level. The 2010 SED identified increased groundwater pumping as a potential reaction to the Policy, although it stated it was "impossible to predict" who or how many persons would take this action. "[W]hen

10

the nature of future development is nonspecific and uncertain, an EIR need not engage in 'sheer speculation' as to future environmental consequences." (*Marin Mun. Water Dist. v. KG Land California Corp.* (1991) 235 Cal.App.3d 1652, 1662 (*KG Land*.) Nonetheless, because of the possibility that the Policy would result in increased groundwater pumping, which could cause significant secondary environmental impacts, the 2010 SED evaluated those impacts as part of its analysis.

After the case was remanded to the Board following the issuance of a writ in the first proceeding brought by Living Rivers, the Board revisited the subject of groundwater pumping and related mitigation measures, particularly the Subterranean Stream Delineations. The 2013 RSED explained that the 2010 SED's environmental analysis was misleading in part because it failed to explain that a potential shift from surface water diversions to groundwater pumping was unlikely to cause a net reduction in surface water flows for various reasons, including the logistical challenges of extracting groundwater in certain areas, the availability of other sources of water and the lack of connectivity between groundwater and surface water in many areas. The drafters of the RSED explained their reasoning in some detail and made clear the extent to which the analysis in the RSED differed from that in the original SED. The RSED "fulfilled its informational purpose" on the subject of groundwater pumping as a potential significant effect. (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 361–363 (*Napa Citizens*) [evolution of traffic analysis through three drafts of EIR was not misleading when it explained the drafters' theories and made no attempt to hide that mitigation measures proposed in initial draft were being deleted].)

We find inapposite the cases cited by Living Rivers in support of its claim the RSED gives conflicting signals when analyzing the environmental effects of increased groundwater pumping. In *Vineyard*, *supra*, 40 Cal.4th at pages 439–442, the Final EIR provided conflicting figures concerning both expected water supply and expected water demand, and gave estimates contrary to a related environmental report. In *San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 655, the EIR on a proposed project to expand the acreage of a mine and its nighttime operations stated

that production would increase while at the same time assuring there would be no increase in production. The RSED, by contrast, revised and clarified certain conclusions made in the earlier SED, but explained the basis for those changes and was internally consistent. (Cf. *Napa Citizens*, *supra*, 91 Cal.App.4th at p. 363.)

A stakeholder wishing to comment on any issue relating to groundwater diversions in connection with the Policy would have understood from the RSED that while such diversions could potentially reduce stream flow, a significant net reduction in flows was unlikely given the information available. The uncertainty regarding the number of water users likely to resort to groundwater diversion as a result of the Policy arises from the situation analyzed by the RSED, not from omissions or inconsistencies in the RSED itself.

C. *The RSED Adequately Described Subterranean Stream Delineations as a Potential Mitigation Measure*

The Board considered and rejected the Subterranean Stream Delineations as a mitigation measure for the reasons outlined above. Living Rivers contends the RSED did not clearly describe what was meant by "adopting subterranean stream delineations," and argues this lack of clarity precluded intelligent public comment. We assume, without deciding, that the alleged defect is an informational deficiency subject to our independent review. (*Communities*, *supra*, 184 Cal.App.4th at p. 83.)[2]

The RSED described in some detail the ways in which groundwater pumping has the potential to affect the flow of surface waters. It explained that the Board's permitting jurisdiction extended to subterranean streams, and that the Board had "directed its

---

[2]     " 'An EIR will be found legally inadequate—and subject to independent review for procedural error—where it omits information that is both required by CEQA and necessary to informed discussion.' But CEQA challenges concerning the amount or type of information contained in the EIR [or] the scope of the analysis . . . are factual determinations reviewed for substantial evidence." (*Santa Monica Baykeeper v. City of Malibu* (2011) 193 Cal.App.4th 1538, 1546.) A strong argument can be made that Living Rivers's challenge to the RSED's description of the Subterranean Stream Delineations concerns the scope of the Board's analysis and should be reviewed under the deferential substantial evidence standard.

consultant, Stetson Engineers Inc., to prepare maps delineating subterranean streams (delineation maps) to potentially improve the effectiveness of the Policy by identifying locations where the State Water Board's permitting authority could be applicable." The RSED provided several reasons for the Board's decision to forego the adoption of the maps as part of the Policy as a mitigation measure. While reasonable minds can differ as to whether the Subterranean Stream Delineations should have been adopted as part of the Policy, their description in the RSED was adequate to enable informed public comment on that issue. (See *Save our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 133.)

D. *The Board's Conclusion that Subterranean Stream Delineations Were Infeasible as a Mitigation Measure Was Not Erroneous*

As part of its report regarding the Subterranean Stream Delineations, which attempted to chart the groundwater over which the Board would have permitting jurisdiction, Stetson proposed that its maps be used to designate "Administrative Pumping Zones" in which well owners would be required to apply to the Board for a permit when the groundwater extracted was from a subterranean stream and was likely to reduce surface water flows. The RSED concluded the adoption of the maps was not feasible as a mitigation measure because their inclusion in the Policy "would be ineffective and inefficient as a mitigation measure for the potential increase in groundwater pumping." Living Rivers contends the Board's reasons for failing to incorporate the Subterranean Stream Delineations into the Policy as a mitigation measure were legally invalid and require the issuance of a writ to vacate the Policy. We disagree.

Where an EIR or substitute environmental document has identified significant environmental effects that have not been mitigated or avoided, the agency may not approve the project unless it first finds that "[s]pecific economic, legal, social, technological, or other considerations . . . make infeasible the mitigation measures or alternatives identified in the environmental impact report." (Cal. Pub. Res. Code, § 21081, subd. (a)(3); Cal. Code Regs., § 15091, subd. (a)(3).) " 'Feasible' means capable of being accomplished in a successful manner within a reasonable period of time, taking

13

into account economic, environmental, social, and technological factors." (Cal. Pub. Res. Code, § 21061.1; see also, Cal. Code Regs., tit. 14, § 15364 [same definition with addition of "legal" factors].) "Mitigation measures are suggestions which may or may not be adopted by the decisionmakers. There is no requirement in CEQA that mitigation measures be adopted. The adoption of mitigations depends, among other matters, upon economic and technological feasibility and practicality." (*No Slo Transit, Inc. v. City of Long Beach* (1987) 197 Cal.App.3d 241, 256.) When identified mitigation measures are infeasible, the project may be approved upon a finding that unavoidable impacts are acceptable because of overriding considerations. (Cal. Pub. Res. Code, § 21081, subds. (a)(3), (b); Cal. Code Regs., tit. 14, §§ 15043, 15091, 15093; *California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 982 (*Native Plant*).)

Living Rivers argues that in finding the adoption of the Subterranean Stream Delineations infeasible as a mitigation measure, the Board relied on two factors that were legally irrelevant to that determination: (1) the uncertainty that surface water users would switch to groundwater pumping as a result of the Policy; and (2) the unlikelihood that any switch to groundwater pumping would deplete surface water flows. Living Rivers contends that while the likelihood and severity of an indirect impact are relevant to the initial determination of whether it is reasonably foreseeable and must therefore be analyzed in an EIR or equivalent environmental document (Cal. Code Regs., tit. 14, § 15064, subd. (d)), those factors may not be considered when evaluating the feasibility of an identified mitigation measure. Having independently reviewed this claim as a challenge to the Board's interpretation of CEQA provisions (*Robinson v. City and County of San Francisco* (2012) 208 Cal.App.4th 950, 955–956), we conclude it is lacking in merit.

To be feasible, a mitigation measure must be "capable of being accomplished in a successful manner" (Pub. Res. Code, § 21061.1), i.e., it must actually be effective in mitigating the identified environmental effect. The likelihood that an indirect effect (such as increased groundwater pumping) will materialize, and the severity of the effect if it does materialize, are relevant to assessing a proposed mitigation measure's likely

success in achieving the goal of protecting the environment. Living Rivers suggests that "considering the relative severity of a significant impact in determining the feasibility of a mitigating measure is unprecedented and wrong." But while the question of an effect's significance is binary in nature, in the sense that a significant environmental effect must be analyzed regardless of *how* significant it is, we see nothing wrong with an agency considering the likelihood or severity of an indirect effect when determining whether a proposed mitigation measure will be successful in ameliorating that effect.

Moreover, " ' "feasibility" under CEQA encompasses "desirability" to the extent that desirability is based on a reasonable balancing of the relevant economic, environmental, social, and technological factors.' " (*Native Plant*, *supra*, 177 Cal.App.4th at p. 1001, citing *City of Del Mar v. City of San Diego* (1982) 133 Cal.App.3d 401, 417.) The likelihood and severity of an indirect significant effect may render a potential mitigating measure either desirable or undesirable when balanced against its cost and the difficulty of its implementation.[3]

Living Rivers suggests that by treating effectiveness as an element of feasibility, the Board conflated the two concepts and ran afoul of the rule that "CEQA does not authorize an agency to proceed with a project that will have significant, unmitigated effects on the environment, based simply on a weighing of those effects against the project's benefits, unless the measures necessary to mitigate those effects are truly infeasible." (*City of Marina v. Board of Trustees of the California State University* (2006) 39 Cal.4th 341, 368 (*Marina*).) We disagree. The "feasibility" of a mitigation measure depends on its capability of being "accomplished in a successful manner" within the meaning of Public Resources Code section 21061.1. Nothing in our review of the case law precludes a consideration of a measure's effectiveness when determining its

---

[3]    This balancing of factors is distinct from (and precedes) the balancing test conducted when adopting a statement of overriding considerations, in which the agency determines whether the benefits of a project with unmitigated significant environmental effects outweigh those unavoidable environmental effects. (*Native Plant*, *supra*, 177 Cal.App.4th at pp. 1002–1003.)

feasibility; indeed, the statute seems to require it. (See *Native Plant*, *supra*, 177 Cal.App.4th at p. 1000 [substantial evidence supported rejection of project alternatives as infeasible because they failed to achieve primary objectives of master plan].)

Even if we assume the likelihood of an impact's occurrence is not a circumstance affecting the feasibility of a measure to mitigate that impact should it occur, the Board's consideration of that factor in this case cannot be viewed in a vacuum. The Board did not simply conclude that adoption of the Delineations was unnecessary because increased groundwater pumping was unlikely. Its remaining reasons for finding the measure infeasible were that (1) the Delineations included only a small portion of the watersheds in the Policy area and would not assist the Board in regulating subterranean streams outside the mapped areas; (2) the Delineations had not been based on field inspections, making additional review necessary; (3) refinement of the Delineations could take between 3.5 years and 12.8 years to complete, and would cost between $1.3 million and $5 million; (4) it was likely water users would raise legal challenges if the Delineations were formally adopted as part of the policy and given a regulatory effect over certain areas; (5) if not adopted as a regulation, with the attendant legal challenges, the Delineations could nonetheless be used by the Board to determine whether a particular groundwater well was within its permitting authority; and (6) even without the Delineations, the Board could regulate unacceptable impacts of increased groundwater pumping based on its authority to prohibit the unreasonable use of water.[4]

Living Rivers challenges each of these determinations as either legally erroneous or unsupported by substantial evidence. (*Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 486 [claims concerning feasibility of mitigation measures reviewed for substantial evidence]; *Masonite Corporation v. County of*

---

[4]    In its response to public comments, the Board emphasized that while it had jurisdiction over subterranean streams, the hydraulic connections between surface streams, percolating groundwater and subterranean streams did not correlate to the legal distinctions between those categories of water, and would be of limited use as an enforcement tool. (See *North Gualala*, *supra*, 139 Cal.App.4th at pp. 1585, 1606.)

16

*Mendocino* (2013) 218 Cal.App.4th 230, 238 [legal feasibility of mitigation measures subject to de novo review].) We disagree.

As already discussed, the effectiveness of the Delineations was a proper consideration when determining their feasibility. Living Rivers's argument that the Delineations would in fact be effective amounts to a policy disagreement that does not vitiate the RSED's factual conclusions. (See *Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1270.) The delay and cost associated with the future review necessary to make the Delineations complete were properly considered by the Board when assessing the feasibility of adopting the Delineations. (See *ibid.*) The prospect of litigation if the Delineations were given regulatory effect was, similarly, an economic factor relevant to feasibility. Considering the Board could use the Delineations to assert jurisdiction on a case-by-case basis even if they were not adopted as part of the Policy, it could reasonably conclude their formal adoption was too costly in light of their limited effectiveness, making the proposed mitigation measure infeasible.

## III. DISPOSITION

The judgment is affirmed. Costs are awarded to respondent.

_____

NEEDHAM, J.

We concur.

_____

SIMONS, ACTING P.J.

_____

BRUINIERS, J.

(A148400)

18

Superior Court of Alameda County, No. RG-14-717629, Evelio Grillo, Judge.

Law Offices of Thomas N. Lippe, Thomas N. Lippe for Plainiff and Appellant.

William Jenkins, Anita Rudd Deputy Attorneys General; Kathleen A. Kenealy, Acting Attorney General of California; Robert W. Byren, Senior Assistant Attorney General; Gavin G. McCabe, Supervising Deputy Attorney General for Defendants and Respondents.